The defendant is a manufacturing corporation organized under the General Corporation act of this state, in 1926. Its original certificate of incorporation provided for a capital stock of $125,000 divided into 25,000 shares of the par value of $5.00 each. By an amendment in 1928 its capital stock was increased to $500,000. The amendment, — (par. Fourth), — reads as follows, — *Page 411 
"Fourth. The total authorized capital stock of this corporation is Five Hundred Thousand ($500,000) Dollars divided into Sixty-two Thousand Five Hundred (62,500) shares and the shares of this corporation are divided into two distinct classes of stock as follows: Twenty-five Thousand (25,000) shares of voting Class "A" fully participating stock at Five ($5.00) Dollars per share, and Thirty-seven Thousand Five Hundred (37,500) shares Class "A" non-voting fully participating stock at Ten ($10.00) Dollars per share."
Subsequently defendant sold and issued 21,700 shares of the Class "A" non-voting stock, for the par value of $217,000. In July, 1934, there were issued and outstanding 22,600 shares of the Class "A" voting stock and 21,700 of the Class "A" non-voting stock, (both classes, for some reason, were designated "Class A").
At that time the board of directors adopted a resolution to further amend paragraph Fourth of the certificate of incorporation, and subsequently filed a certificate of such amendment; which amendment made paragraph Fourth read as follows: —
"4th. The total authorized capital stock of this corporation is Five Hundred Thousand Dollars ($500,000), consisting of one hundred thousand shares, and the shares of this corporation shall be divided into two distinct classes, as follows: twenty-five thousand shares of voting Class "A" fully participating stock at par value of Five Dollars ($5.00) per shart, and seventy-five thousand shares of stock non-voting Class "A" fully participating shares of stock at the par value of Five Dollars ($5.00) per share. The present stockholders of record shall be given the right to exchange their present holdings of Class "A" fully participating non-voting stock, share for share, for the new class fully participating Class "A" non-voting stock."
Thereafter the defendant company took $108,500 from the capital stock account of the non-voting stock and transferred it to the capital surplus account of the company; notified the holders of the non-voting stock that it was "necessary" for them to surrender their certificates of $10.00 par stock and receive instead an equal number of shares of $5.00 par stock; and declared a dividend of 25 cents per share on all the stock, — valuing the non-voting stock at $5.00 per share, the same as the voting stock. *Page 412 
Complainant, the holder of 185 shares of the non-voting stock thereupon filed his bill of complaint herein, setting forth the foregoing facts, and also the further facts that no publication was made, as required by the statute, of the reduction of capital stock, and that no vote was had, nor any opportunity to vote, by the holders of the non-voting stock, on the proposed reduction. The bill charges that the attempted reduction of the non-voting stock to the par value of $5.00 per share is unlawful and void; that it is a wrongful taking of property and rights from the holders of the non-voting stock, and that the declaration and payment of a dividend of an equal amount per share to the voting stock ($5.00 par) and the non-voting stock, ($10.00 par) wrongfully deprives the holders of the non-voting stock of the share in the earnings to which they are entitled.
The bill prays that the aforesaid acts of the defendant be set aside as null and void, and that the defendant be restrained from reducing its capital stock in that manner and from paying any dividend other than on the basis that the amount payable on each share of the non-voting ($10.00 par) stock shall be twice as much as that payable on each share of the voting ($5.00 par) stock.
After the filing of the bill a supplement was filed, on leave granted, setting forth that subsequent to the filing of the bill the defendant had determined to disregard the illegally passed amendment and had sent out notices of a meeting of stockholders to be held to pass on the question of a legal adoption of the proposed amendment; that it had obtained proxies in favor of such proposed amendment from a considerable number of holders of the non-voting stock which it proposed voting at such meeting in favor of such amendment; that the said proxies had been obtained from said stockholders as the result of misrepresentation. It was prayed that the defendant be restrained from holding said proposed meeting unless and until the holders of the non-voting stock should be fully and truly advised as to the situation; and that defendant be required to furnish complainant *Page 413 
with a list of the names and addresses of the holders of the non-voting stock.
On this supplement, an order to show cause was issued, returnable at the same time as the hearing on an order to show cause issued on the original bill. No answering affidavits were filed, and no answer to the bill or supplement was filed, — but on the return day of the order to show cause, a final decree was entered by consent.
This final decree adjudicated the filed 1934 amendment of the certificate of incorporation to be null and void and enjoined the defendant from doing anything to put it into effect. It further directed the defendant to return to those holders of non-voting stock who had already surrendered their certificates, the certificates so surrendered; to transfer the $108,500 back from surplus to capital stock account; and enjoined the holding of the stockholders' meeting mentioned in the supplement to the bill.
This final decree however specifically reserved for determination the questions (1) as to whether the dividend declared in 1934 should not be adjusted so that the amount payable on each share of non-voting stock should be twice as much as that payable on each share of voting stock; (2) as to whether defendant should be enjoined from paying any dividend which does not provide for the payment on each share of non-voting stock of an amount twice as great as the amount payable on each share of voting stock; and (3) whether defendant should be required to furnish the complainant with a list of the names and addresses of the holders of the non-voting stock.
At the time of the entry of this consent decree it was stated orally to the court that the determination of the questions so reserved was to be made by the court on the basis of the facts as set forth in the bill and supplement and on briefs to be submitted by both parties, — which briefs have now been submitted.
The questions now to be determined herein are therefore essentially only two, — first, whether or not under the circumstances of this case, the defendant corporation may lawfully *Page 414 
declare and pay a dividend on its stock, (without the consent of the holders of the non-voting stock), unless such dividend shall provide payment of an amount of money on each share of non-voting ($10.00 par) stock twice as great as the amount on each share of voting ($5.00 par) stock; and second, whether the defendant company is required to furnish complainant with a list of the names and addresses of the holders of the non-voting stock.
Taking up these questions in inverse order, — section No. 33 of the Corporation act requires every corporation to keep at its office in this state a stock book containing the names and addresses of its stockholders, and provides that such stock book shall be "open to the examination of every stockholder" at all times during usual business hours.
Defendant contends that in order to entitle him to the enforcement of this right, a stockholder must show that its exercise is sought in good faith and for a specific purpose relating to the applicant's interests as a stockholder or germane to his status as such stockholder, — citing Bruning v. HobokenPrinting, c., Co., 67 N.J. Law 119, and O'Hara v. NationalBiscuit Co., 69 N.J. Law 198. Assuming this contention to be correct, (cf. Vernam v. Scott, 12 N.J. Mis. R. 177) it seems clear that complainant clearly is within the limitation.
He is a stockholder and the purpose of his application is specifically set forth in the prayer to the supplement to the bill, — to wit, "so that complainant may correspond with the said holders of non-voting stock and apprise them fully of the purpose and effect of the said illegal amendment and of any similar amendment which the defendant intends to adopt." The facts set forth in the bill and supplement, — admitted by defendant to be true, — show that defendant did attempt to amend its certificate of incorporation improperly and illegally and to such effect as materially to injure the rights of the non-voting stockholders; and that although it later determined to disregard that illegal amendment, it still intended to endeavor to adopt an amendment to the same effect and with the same result on the non-voting stockholders *Page 415 
and that in that intent and endeavor it had sent notices to the non-voting stockholders containing material misrepresentations of fact. Assuredly a stockholder has the right to communicate with his co-stockholders concerning matters involving the conduct of the corporation and their interests as stockholders, Withington
v. Bradley, 111 Me. 384, at 388, 89 Atl. Rep. 201; and for such purpose clearly is entitled to the right to inspect the list of stockholders and their addresses. Particularly must this be true where the corporate officers and directors have been guilty of unlawful and improper conduct such as is here shown. To deny a stockholder the means of his apprising his co-stockholders as to the real truth of matters as to which the officers and directors had misinformed such stockholders would be unthinkable.
The right to inspect the stock book in this behalf includes the right to make copies or memoranda therefrom, 4 Fletcher, Cyc. ofCorp., p. 4123-4, paragraph 2840, — even at common law, 14 C.J.p. 861.
It does not appear by the pleadings or the strict record, that application to inspect and make copies was made and refused; but it is obvious, from the resistance made in defendant's briefs, that such application would have been futile, — would have been refused if made.
The present application however is not merely for leave to inspect and make copies; it is for an order directing the defendant to furnish complainant with a list of the names and addresses. This application was made by prayer in the supplement to the bill and was incorporated in the order to show cause entered thereon. Presumably it was based on the provisions of chancery rules 85, 86. Defendant so contends, — and argues that because of the entry of the decree hereinbefore mentioned, the cause is no longer pending and the provisions of these rules are not applicable.
The point is perhaps not free from doubt. The cause is certainly still pending; the issues herein considered are still undetermined and to be determined. Moreover, although the decree already entered nullifies the attempted amendment of 1934 and enjoins defendant from doing anything to put that *Page 416 
amendment into effect, it clearly appears from the briefs and letters of counsel that defendant intends hereafter to attempt to adopt, after due legal procedure, a similar amendment. On the other hand, all facts upon which the determination of the question is to be made, are already before the court; the information sought as to the names and addresses will be of no relevance or aid to the court in making that determination, nor will it be of any use or benefit to complainant in presenting the case to the court.
On the whole, it is deemed that complainant is entitled to, and will be sufficiently protected by, an order directing the defendant to permit complainant or his solicitors to inspect the stock book and make a copy of the names and addresses of the stockholders.
The remaining question is whether defendant has the right to declare and pay any dividend on its stock which shall not provide for the payment on each share of non-voting stock of a sum or amount twice as great as that payable on each share of voting stock.
It will be remembered that the original certificate of incorporation provided for nothing but one kind of stock, — 25,000 shares of a par value of $5.00 each; and that this was amended in 1928 to provide that the stock should be $500,000, divided into 62,500 shares, of which 25,000 shares should be "voting * * * at $5.00 per share," and 37,500 should be "non-voting * * * at $10.00 per share," — both classes to be "fully participating."
Both sides concede that in the declaration and payment of dividends all the stockholders must be treated equally or alike; the issue is as to what constitutes such equal or similar treatment. Defendant contends it is, and can only be, accomplished by giving to each share of non-voting stock a dividend of the same amount, (25 cents), as that given to each share of voting stock. Complainant contends that it can only be accomplished by giving to each share of non-voting, ($10.00 par value), stock a dividend of 50 cents, if a dividend of 25 cents is given to each share of voting, ($5.00 par value), stock. *Page 417 
If there were any specific provisions in the certificate of incorporation, in this behalf, they would doubtless be controlling; but in the present instance there is nothing beyond what has already been stated. The entire certificate of incorporation has not been put in evidence; — so far as appears in this case there is nothing therein which affects the rights of the two classes of stockholders, except the paragraph "Fourth," hereinbefore quoted; and that this is indeed the fact is conceded, at least tacitly, by the briefs of counsel. The only other facts appearing, which might be relevant or material, are that 21,700 shares of the non-voting, $10.00 par, stock were sold for the par value price, and are still outstanding; that $22,600 of the voting, $5.00 par, stock have been issued and are outstanding; that defendant took $108,500 from its capital stock account and transferred it to "surplus"; and that defendant has set aside for the payment of the proposed dividend some $11,000 which was "taken out of the surplus created by the reduction of the par value of the non-voting stock" from $10.00 to $5.00 per share.
The question seems to be completely res nova; — which is not surprising. It may well be doubted that any similar instance of corporate organization ever existed. It is said by defendant's counsel (although there is no evidence or proof) that the explanation of the curious set-up is that the original incorporators desired to obtain additional capital, but at the same time to retain to themselves complete control of the business. It is further said by defendant's briefs that at the time the non-voting, $10.00 par, stock was created and sold, it was understood by the purchasers thereof that they were paying $10.00 a share for shares which would stand on only an equal basis per share with the $5.00 shares previously issued, because the concern was a going and successful concern, — but there is no proof of any of this before the court, and it is all denied by complainant's briefs.
The industry of counsel has furnished the court with many citations and quotations, few of which however are of any real materiality on the present issue because the circumstances *Page 418 
of the present case were neither before the court, nor within the contemplation or consideration of the court, in the cited cases.
The contention of defendant is that "shares are shares," so to speak; that all shares must be equal if there is no specific provision making them of unequal value; and that the provisions as to the par value in the two respective classes does not make the shares in the two classes unequal; that the actual capital of a corporation is not the aggregate of the number of shares multiplied by the par value, but may be more or less, — instancing corporations with shares of "no par value."
The answer to that contention is that we are not dealing here with a corporation whose certificate provides for shares of no par value; and this case must be determined by its own particular facts and circumstances. Where corporations have stock of "no par value," that stock is common stock, and the shares of that common stock are of course all of equal value; but the preferred stock is dealt with separately, and the value and priority of payment in respect thereof, both as to dividends and distributive value on dissolution, are specifically provided for.
In the instant case, the certificate of incorporation does not say that the shares are all to be of equal value. It says "the capital stock shall be $500,000 divided into 62,500 shares" and immediately goes on to say that those shares shall be divided into two distinct classes, "25,000 shares * * * at $5.00 per share and 37,500 shares * * * at $10.00 per share." From this it would seem to follow as a natural, if not indeed a necessary, inference that the entire 62,500 were not intended to be all of equal value, but that 37,500 of them were intended to be each of a value twice as great as that of each of the other 25,000 shares. No other conceivable explanation occurs, consonant with the fixing of the price of the non-voting shares twice as great as that of the voting shares. (If the price had been fixed conversely, — $10.00 for the voting shares and $5.00 for the non-voting shares, defendant's argument would be much more rationally acceptable). *Page 419 
Suppose, in the case of the present corporation, all of the stock had been issued at the incorporation of the company, — 25,000 shares at $5.00 and 37,500 shares at $10.00, — and that for some reason or other, (possibly an unexpected determination of invalidity of a patent, or a sudden declaration of war, or what not), it was determined before anything further had been done, that the company should not proceed but should immediately be wound up. Can there be any doubt but that each holder of the non-voting stock would expect, — and would have the right to expect, — that he would get back the $10.00 per share that he had paid in a few days earlier? Upon what principle could the holder of voting stock who had a few days earlier paid in $5.00 per share, expect or claim the right to receive back $8.00 per share, and to make the holder of non-voting stock accept $8.00 instead of the $10.00 he had just paid?
Of course, if the certificate of incorporation had said that the 62,500 shares were to be equal shares, there would be no question. But under the facts and circumstances of this case, so far as they are made to appear to the court, no one would have paid in $10.00 per share for shares of only equal value with those which others could get for $5.00 per share, — nay, less than equal value, for they had no voting right or powers.
As has already been said, it does appear herein that the holders of the non-voting $10.00 stock paid into the company $10.00 per share. It must be assumed that the holders of the voting $5.00 stock paid in $5.00 per share. There is no proof that they paid more, — and no presumption that they paid more.
It must be concluded that the shares of non-voting, $10.00 par, stock represent each a 2/100,000 fraction of the capital assets of the company and that the shares of voting, $5.00 par, stock represent each a 1/100,000 fraction of such capital assets; — that the former have each a value twice as great as that of each of the latter.
The capital stock of a corporation is divided into portions called shares; and a share of stock in a corporation is the interest and right which the holder has in the assets, income *Page 420 
and management of the corporation. It represents his proportionate interest in the company, in its capital and net earnings, and fixes the amount of his payment into the corporate assets. See 14 C.J., p. 384, § 506, and cases cited. See also our Corporation act, § 8, subsection IV, § 21 and § 86.
 Usually this division of the corporate stock is into equal
shares, — at least where there is only one class of stock, — shares all equal and similar in all respects, both as to the rights of the holder in the net assets, in the earnings, and in the management of the company. But there is no requirement that the division must be characterized by such equality. The characteristics of the division, under our law, are permitted to be, and are, fixed and determined by the provisions of the certificate of incorporation. In other words, they are determined by the stockholders themselves, — they are fixed in accordance with whatever the persons who form the company agree on. Persons who subsequently become interested in the purchase of shares can ascertain, by referring to the certificate of incorporation, just what the characteristics of those shares are, — and determine thereby whether or not they wish to purchase and become stockholders under those conditions.
Provisions for certain kinds of inequality among the shares of stock are very frequent, — and are specifically recognized in our statute. Corporation act, § 18. Division of the stock into classes having different voting rights is one example, — where the rights or interests of the shares in the management of the company are not equal. The well-known division into preferred and common stock is another example, — where the interests of the shares in the earnings are not equal. In such a division the interests of the two classes in net assets on winding up and distribution are some times equal and some times the preferred stock has prior or superior rights in this respect also. In this latter event, the rights or interests of the shares in the netassets of the company, are not equal as between the two classes. *Page 421 
Clearly then there is nothing to prevent or prohibit a corporation from dividing its capital stock into divisions or shares which are not all equal each to the other, — from dividing it into shares some of which have rights or interests in the net assets and in the earnings twice as great as the rights or interests of the remaining shares.
As has already been shown, this corporation did, by its certificate of incorporation (amendment of 1928) divide its stock into two classes, — one class consisting of 25,000 shares, of the par value of $5.00 each and having voting rights; and the other class consisting of 37,500 shares, of the par value of $10.00 each, but having no voting rights. The aggregate shares in these two classes total 62,500, which is the total specified authorized number of shares; and the aggregate par value thereof, at therespective par value rates, totals the total, specified, authorized capital. The 25,000 shares at $5.00 each, aggregate $125,000, which is 1/4 of the total capital of $500,000; and the 37,500 shares at $10.00 each, aggregate $375,000, which is the other 3/4 of the total capital. The result is that each $5.00 share represents a fraction or interest of 1/25000 of 1/4, — or 1/100,000, — of the total capital or net assets; and each $10.00 share represents a fraction or interest of 1/37500 of 3/4, — or 1/50,000, — or 2/100,000, — of the total capital or net assets.
In other words, — one-quarter ($125,000) of the total capital has been divided into 25,000 shares, each of which is therefore 1/100,000 of the total capital; and the remaining three-quarters ($375,000) of the total capital has been divided into 37,500 shares each of which is therefore 2/100,000 or 1/50,000 of the total capital. And these respective shares or fractional interests in the authorized capital stock, must needs continue to be the same thereafter, in the actual capital or net assets of the corporation as that may vary from time to time by way of increase or decrease.
Now with respect to the profits earned upon the capital stock, and distributed in dividends, — there is no dispute between the present parties as to the principle that there can be no discrimination between stockholders. All stockholders, *Page 422 
— at least all in the same class, — must be treated alike; each stockholder is entitled to share in the dividend in proportion to the amount of his holdings. 14 C.J., p. 813, par. 1236; p. 817,par. 1240.
Defendant however says that this principle means that each stockholder must share in the dividend in proportion to the number of shares of stock held by him, — irrespective of the difference in the fractional interest in the capital stock of the corporation represented by one share as compared with another, and regardless of the fact that the certificate of incorporation contains no such provision. With that contention this court cannot agree.
If this corporation had only one class of stock, — or if all of its stock were divided into shares each of which represented the same fractional interest in the capital as each of the others, and there was no provision in the certificate of incorporation entitling a share in one class to a different amount of the profits or dividend than that of a share in the other class, — then each stockholder would be entitled to dividends in proportion to the number of shares held by him.
This corporation however has divided its capital into shares of two different classes, and in the one class, (the non-voting stock) each share represents a fractional interest in the capital twice as great as the interest represented by each share of the other class, (the voting stock).
It would have been possible, and legal, for the corporation to have provided in its certificate of incorporation, that each share in both classes alike should share equally with each other share, regardless of its class, in any distribution of profits or dividends. This however it did not do, — either specifically or by implication. The presumption, or conclusion, must be, therefore, that each share is entitled to share equally with all other shares, in the profits or dividends, inproportion to the fractional interests in the capital represented by the respective shares, — and this on the principle that equality is equity.
Section 47 of the statute requires each corporation (in the absence of provision to the contrary in the certificate of incorporation) *Page 423 
to declare and pay to and among its stockholders in January of each year "a dividend * * * of the whole of its accumulated profits" (over and above such sum as may have been fixed and set aside as working capital). Neither in this section, nor in any other provision of the statute, is there expressly set forth the method of computation of such dividend.
All surplus assets or accumulated profits, however, are obviously, prior to the setting apart or declaration of a dividend, simply a part of the capital assets or principal of the corporation. As has already been said, the respective share or fractional interest (of the holder of any particular share of stock), in the total, net, corporate capital assets remains the same whether those net assets increase or decrease. The fractional interest in the profits, prior to declaration of a dividend, to which the holder of a share of stock is entitled, is therefore the same fraction as his fractional interest in the original capital stock. Clearly that fraction is not changed by the mere declaration of a dividend, — there being no provision in the certificate of incorporation, nor in the statute, for any such change.
Quite the contrary is the implication to be gathered from section 86 of the statute. That section provides that in a distribution of the assets of an insolvent corporation, — i.e.
a corporation which has lost money instead of making profits, — the surplus funds, after payment of the corporation's creditors, (and preferred stockholders, if any), shall be divided among the stockholders "proportionally, according to their respective shares." This latter must of course mean, "in proportion to the respective fractional interests owned by them in the corporation's capital." The result is that each share of stock bears the same fraction of the total losses of the company as the fraction of the total capital of the company which it originally represented.
If the losses are to be borne in this proportion, then equitably the profits should be shared in like manner, — there being no provision otherwise either in the statute or the certificate of incorporation. *Page 424 
The presumption must be, in the absence of any other agreement or legal requirement, that the stockholders will be entitled to share in the profits in proportion to the amounts respectively contributed by them to the capital. If, in the present instance, the entire corporate capital of $500,000 had been divided into only three shares, one of $250,000 and the other two of $125,000 each, the result might perhaps be a little more readily apparent, but the principle would be exactly the same.
It is concluded therefore that the dividend declared in 1934, if it is to be paid at all, must be adjusted so as to provide for payment of dividends on the respective shares in proportion to the respective fractional interest of the capital represented by the respective shares, — for the payment of an amount on each share of non-voting stock twice as great as the amount payable on each share of voting stock; and defendant will be enjoined from the payment of any dividend on any other basis.
The expression above, — "if it is to be paid at all," — is occasioned by the fact that it seems to appear on the record that this dividend was declared out of the surplus created by the illegal reduction of the value of the non-voting shares. If there is no other surplus out of which this dividend can be paid, obviously it cannot legally be paid at all. Moreover, it may be that in the judgment of the directors, no dividend should be paid at this time, in view of the setting aside of this "surplus" and the resultant condition of the corporation as to surplus and undivided profits. It would seem that the decree probably should be framed only to restrain the payment of dividends on any other basis than that herein adjudicated. *Page 425